**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000052
20-APR-2012
09:21 AM**

NO. CAAP-11-0000052

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


DARRYL D. PERRY, Appellant-Appellant,
v.
BOARD OF TRUSTEES OF THE EMPLOYEES RETIREMENT SYSTEM,
STATE OF HAWAI'I, Appellee-Appellee


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 10-1-0891)


MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Leonard, JJ.)

In this secondary appeal of an administrative agency
decision, Petitioner-Appellant Darryl D. Perry (Perry) appeals
from the Final Judgment filed on March 24, 2011 in the Circuit
Court of the First Circuit[1] (circuit court). The circuit court
entered judgment in favor of Respondent-Appellee Board of
Trustees of the Employees' Retirement System of the State of
Hawai'i (ERS) and against Perry pursuant to the circuit court's
"Decision and Order Affirming Findings of Fact, Conclusions of
Law and Final Decision and Order of the [ERS]" (Decision and
Order) filed on January 6, 2011.

On appeal, Perry contends the circuit court erred by:

(1)  concluding that at the time of Perry's re-
employment on October 1, 2007 as Kaua'i Chief of Police (police

---

[1]  The Honorable Karl K. Sakamoto presided.

chief), Hawaii Revised Statutes (HRS) § 88-98 (Supp. 2007) allowed ERS to suspend Perry's Honolulu Police Department (HPD) retirement benefits while excluding Perry from earning further retirement benefits as police chief;

(2) concluding that Perry was not entitled to earn additional retirement benefits when ERS had (1) required him to enroll as an ERS member, (2) suspended his HPD retirement benefits, and (3) deducted ERS contributions from his paychecks for two years;

(3) applying HRS § 88-98(c) (Supp. 2011) retroactively to Perry's retirement benefits because such application diminished or impaired Perry's accrued benefits, thus violating Perry's rights under article XVI, section 2 of the Hawai'i Constitution;

(4) concluding that Perry waived his Contract Clause claim under article I, section 10 of the United States Constitution because he did not raise this argument before ERS; and

(5) concluding that the issue regarding ERS's deductions from Perry's paychecks for two years was moot because ERS committed to returning Perry's contributions with interest.

## I.  BACKGROUND

Perry retired from HPD on December 31, 2002 and began collecting his retirement benefits.  On October 1, 2007, Perry returned to service as police chief.  Perry re-enrolled as a class B member of ERS as required under HRS §§ 88-47(a)(2) (Supp. 2007)[2] and 88-98(a) (Supp. 2007).[3]  Pursuant to HRS § 88-98(a),

---

[2]  HRS § 88-47 provides, in pertinent part:

(2)  Class B shall consist of:
    (A)  Police officers and firefighters, including former
       retirants who return to service in such capacity[.]

[3]  HRS § 88-98(a) provides, in relevant part:

    **§88-98  Return to service of a retirant.**  (a)  Any retirant
who returns to employment requiring active membership in the
system shall be reenrolled as an active member of the system in
the same class from which the retirant originally retired and the

2

ERS should have suspended Perry's retirement benefits from October 1, 2007, but failed to do so until October 16, 2007. In a letter dated February 29, 2008, ERS informed Perry of this oversight and requested Perry reimburse ERS for the retirement benefits ERS had inadvertently paid him. In this same letter, ERS assured Perry that "any benefit you accrue during this new membership will be calculated separately and added to your pension amount."

Pursuant to HRS § 88-45 (Supp. 2010), Perry contributed to the ERS annuity savings fund when he re-entered service as police chief. ERS interpreted federal tax law to require that any contributions collected from a member that could not be used to provide a benefit to the member must be returned to the member as excess contribution. In other words, if the member was not entitled to accrue additional retirement benefits, ERS would have to return those contributions to the member.

---

retirant's retirement allowance shall be suspended.

(1)     If the retirant returns to service before July 1, 1998, and again retires, the retirant's retirement allowance shall consist of:

(A)     For members with fewer than three years of credited service during the member's period of reemployment, the allowance to which the member was entitled under the retirement allowance option selected when the member previously retired and which was suspended; plus, for the period of service during the member's reemployment, the allowance to which the member is entitled for that service based on the retirement allowance option initially selected and computed for the member's age, average final compensation, and other factors in accordance with the benefit formula under section 88-74 in existence at the time of the member's latest retirement;

. . .

(2)     If the retirant returns to service after June 30, 1998, and again retires, the retirant's retirement allowance shall be computed in accordance with paragraph (1)(A), regardless of the number of years of service in the reemployment period.

In a September 23, 2009 letter, ERS informed Perry that when he returned to service on October 1, 2007, he had already reached the 80% cap on his maximum retirement allowance and therefore, was not eligible to accrue any additional retirement benefits. ERS explained that in "the recent legislative session, the Legislature adopted legislation confirming that retirants, like you, who return to service after reaching the cap on maximum retirement allowance and who there[fore] are not eligible to accrue additional retirement benefits, do not have to pay retirement contributions to [ERS]." Perry was told ERS would no longer deduct contributions from his salary and would reimburse him for contributions he had made since re-entering service.

Perry filed a Petition for Declaratory Order on October 15, 2009 challenging ERS's contention that he did not qualify for additional retirement benefits. In response to e-mail inquires from Perry, ERS sent a letter dated October 19, 2009 reiterating its position that Perry was not entitled to additional retirement benefits. ERS advised Perry of his right to appeal, which he did on November 8, 2009 via a Statement of Appeal.

ERS and Perry stipulated to have ERS hear the matter by written submission of the parties. ERS considered the case at its HRS Chapter 91 meetings on February 8, 2010 and March 8, 2010. ERS entered its Findings of Facts, Conclusions of Law, and Final Decision and Order (ERS Order) on March 23, 2010. Perry filed his appeal to the circuit court on April 26, 2010.

The circuit court heard the case on September 28, 2010. On January 6, 2011, the circuit court entered its Decision and Order Affirming [ERS Order] (January 6, 2011 Order). On January 26, 2011, Perry filed a notice of appeal from the January 6, 2011 Order. On March 24, 2011, the circuit court reduced the January 6, 2011 Order to a Final Judgment in favor of ERS and against Perry.[4]

_____

[4] Perry filed his January 26, 2011 notice of appeal prematurely, after the circuit court filed the January 6, 2011 Order but before it entered the March 24, 2011 Final Judgment. However, Perry's appeal is timely pursuant to

4

## II.  STANDARDS OF REVIEW

### A.  Secondary Appeal

"'Review of a decision made by a court upon its review of an administrative decision is a secondary appeal.  The standard of review is one in which [the appellate] court must determine whether the court under review was right or wrong in its decision.'"  *Leslie v. Bd. of Appeals of County of Hawaii*, 109 Hawai'i 384, 391, 126 P.3d 1071, 1078 (2006) (quoting *Lanai Co., Inc. v. Land Use Comm'n*, 105 Hawai'i 296, 306-07, 97 P.3d 372, 382-83 (2004) (other citation omitted)).  The standards as set forth in HRS § 91-14(g) (1993) are applied to the agency's decision.  *Ka Pa'akai O Ka'aina v. Land Use Comm'n*, 94 Hawai'i 31, 40, 7 P.3d 1068, 1077 (2000).  HRS § 91-14(g) provides:

> (g)    Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1)    In violation of constitutional or statutory provisions; or
>
> (2)    In excess of the statutory authority or jurisdiction of the agency; or
>
> (3)    Made upon unlawful procedure; or
>
> (4)    Affected by other error of law; or
>
> (5)    Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6)    Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"'Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).'"  *Sierra Club v. Office of Planning, State of Hawai'i*, 109 Hawai'i 411, 414, 126 P.3d 1098, 1101 (2006) (quoting *In re Hawaiian Elec. Co.*, 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (other citation omitted)).

"'An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.'"  *Poe v. Hawai'i Labor Relations Bd.*, 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004) (quoting *Kilauea Neighborhood*

---

Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(2), which allows for a premature notice of appeal.

> *Ass'n v. Land Use Comm'n*, 7 Haw. App. 227, 229-30, 751 P.2d
> 1031, 1034 (1988)). "'The courts may freely review an
> agency's conclusions of law.'" *Lanai Co.*, 105 Hawai'i at
> 307, 97 P.3d at 383 (quoting *Dole Hawaii Div.-Castle &*
> *Cooke, Inc. v. Ramil*, 71 Haw. 419, 424, 794 P.2d 1115, 1118
> (1990) (other citation omitted)). "Abuse is apparent when
> the discretion exercised clearly exceeds the bounds of
> reason or disregards rules or principles of law or practice
> to the substantial detriment of a party litigant." *Kimura*
> *v. Kamalo*, 106 Hawai'i 501, 507, 107 P.3d 430, 436 (2005)
> (internal quotation marks and citation omitted).

Brescia v. North Shore Ohana, 115 Hawai'i 477, 491-92, 168 P.3d

929, 943-44 (2007) (brackets in original omitted).

### B.   Deference to Administrative Agency Decision

In determining whether an agency determination should
be given deference, the standard to be applied is as
follows:

> [W]hen reviewing a determination of an administrative
> agency, we first decide whether the legislature
> granted the agency discretion to make the
> determination being reviewed. If the legislature has
> granted the agency discretion over a particular
> matter, then we review the agency's action pursuant to
> the deferential abuse of discretion standard (bearing
> in mind that the legislature determines the boundaries
> of that discretion). If the legislature has not
> granted the agency discretion over a particular
> matter, then the agency's conclusions are subject to
> de novo review.

> *Paul's Electrical Service, Inc. v. Befitel*, 104 Hawai'i 412,
> 419-20, 91 P.3d 494, 501-[02] (2004).

Olelo: The Corp. for Cmty. Television v. Office of Info.

Practices, 116 Hawai'i 337, 344, 173 P.3d 484, 491 (2007).

"[I]n deference to the administrative agency's

expertise and experience in its particular field, the courts

should not substitute their own judgment for that of the

administrative agency where mixed questions of fact and law are

presented. This is particularly true where the law to be applied

is not a statute but an administrative rule promulgated by the

same agency interpreting it." Camara v. Agsalud, 67 Haw. 212,

216, 685 P.2d 794, 797 (1984) (citations omitted).

## C.   Statutory Interpretation

> The interpretation of a statute is a question of law that is reviewed de novo.

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists[.]

> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.  Moreover, the courts may resort to extrinsic aids in determining legislative intent.  One avenue is the use of legislative history as an interpretive tool.

> [The appellate] court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it [] to discover its true meaning.  Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other.  What is clear in one statute may be called upon in aid to explain what is doubtful in another.

Morgan v. Planning Dep't, County of Kaua'i, 104 Hawai'i 173, 179-80, 86 P.3d 982, 988-89 (2004) (citations and internal quotation marks omitted).

> [W]here an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

Id. at 180, 86 P.3d at 989 (citing Ka Pa'akai O Ka 'Aina v. Land Use Comm'n, State of Hawai'i, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000)).  Stated differently:

> Where an agency is statutorily responsible for carrying out the mandate of a statute which contains broad or ambiguous language, that agency's interpretation and application of the statute is generally accorded judicial deference on appellate review.  Vail v. Employees' Retirement System, 75 Haw. 42, 59, 856 P.2d 1227, 1237 (1993).  However, an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent

7

> with both the letter and intent of the statutory mandate. Kahana Sunset Owners v. County of Maui, 86 Hawai'i 66, 72, 947 P.2d 378, 384 (1997).
>
> TIG Ins. Co. v. Kauhane, 101 Hawai'i 311, 321, 67 P.3d 810, 820 (App. 2003) (brackets and internal quotation marks omitted).

Haole v. State of Hawai'i, 111 Hawai'i 144, 149-50, 140 P.3d 377, 382-83 (2006) (some brackets in original and some added).

### D. Legislative Intent

The appellate court "derives legislative intent primarily from the language of statute and follows the general rule that in the absence of clear legislative intent to the contrary, the plain meaning of the statute will be given effect." State v. Akina, 73 Haw. 75, 78, 828 P.2d 269, 271 (1992) (citation omitted).

### E. Mootness

"It is axiomatic that mootness is an issue of subject matter jurisdiction. Whether a court possesses subject matter jurisdiction is a question of law reviewable de novo." Hamilton ex rel. Lethem v. Lethem, 119 Hawai'i 1, 4-5, 193 P.3d 839, 842-43 (2008) (internal quotation marks and citation omitted).

### F. Constitutional Questions

The Hawai'i Supreme Court stated in In re Guardianship of Carlsmith, 113 Hawai'i 236, 151 P.3d 717 (2007):

> [The appellate court] reviews questions of constitutional law de novo under the right/wrong standard and, thus, exercises its own independent constitutional judgment based on the facts of the case. [The appellate court] as a general matter, has long adhered to the proposition that (1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable.

Id. at 239, 151 P.3d at 720 (internal quotation marks and citations omitted).

## III. DISCUSSION

Pursuant to HRS § 88-74 (Supp. 2010),[5] during Perry's years of service as a police officer, he contributed 2.5% of each paycheck into the ERS annuity fund that formed the basis of his retirement allowance. A police officer's retirement allowance is calculated as follows: average final compensation x years of credited service x 2.5%, provided the officer's maximum retirement allowance does not exceed 80% of the officer's average final compensation.

When Perry retired from HPD on December 31, 2002, he was credited with 32 years and 7 months (32.583 years) of service. Based on service credit earned for actual service, Perry exceeded the 80% benefit cap (32.583 years x 2.5% = 81.458%).

---

[5] HRS § 88-74 provides, in relevant part:

**§88-74. Allowance on service retirement.** (a) Upon retirement from service, a member shall receive a maximum retirement allowance as follows:

(1)   If the member has attained age fifty-five, a retirement allowance of two per cent of the member's average final compensation multiplied by the total number of years of the member's credited service as a class A and B member, . . . provided that:

(A)   After June 30, 1968, if the member has at least ten years of credited service of which the last five or more years prior to retirement is credited service as a firefighter, police officer, or an investigator of the department of the prosecuting attorney;

. . .

then for each year of service as a firefighter, police officer, . . . the retirement allowance shall be two and one-half per cent of the member's average final compensation. The maximum retirement allowance for those members shall not exceed eighty per cent of the member's average final compensation. (Emphasis added.)

9

Perry also had accumulated 560.75 days (2.333 years) of unused sick leave. Under HRS § 8-63 (1993),[6] service credit received from unused sick leave was not subject to the 80% benefit cap. Adding the service credits for his unused sick leave to his credits for actual service increased Perry's maximum retirement allowance to 85.8333% of his average final compensation (80% + (2.333 years x 2.5%) = 85.8333%).

In 2009, in an effort to avoid the administrative process of collecting contributions from an employee, only to subsequently pay them back to the employee because the employee was not entitled to accrue additional benefits, Act 121 was introduced in the Hawaiʻi Legislature. Act 121, which took effect July 1, 2009, amended several sections of HRS Chapter 88, including section 88-98. 2009 Haw. Sess. Laws 316-22. Act 121 clarified that a retirant re-entering service, who had reached the 80% cap, "shall not make any contributions under section 88-45" and "shall not earn service credit or earn any additional retirement allowance." HRS § 88-98(c)(2) (Supp. 2010).

---

[6] HRS § 88-63 provides as follows:

**§88-63 Credit for unused sick leave.** A public employee who retires or leaves government service in good standing with sixty days or more of unused sick leave shall be entitled to additional service credit in the retirement system as follows:

(1) An employee with sixty days of unused sick leave to the employee's credit shall have the employee's years of service increased by three months for the purpose of computing the employee's retirement allowance.

(2) For each additional twenty days or major fraction thereof of unused sick leave in excess of sixty days that the employee has to the employee's credit the employee shall have the employee's years of service increased by one month for the purpose of computing the employee's retirement allowance.

The allowance on service retirement of section 88-74 and the service benefit limitation therein shall not apply to retirement allowances which exceed such limitations by virtue of the application of this section in the computation of retirement allowances and no reduction in such retirement allowances shall be made on account of such limitations.

> A. The circuit court did not err in concluding that Perry was not entitled to additional retirement benefits when he had reached his maximum benefit cap in his first service.

Perry contends that, under the version of HRS § 88-98 in effect on October 1, 2007 when he took the position as police chief, he was entitled to accrue additional retirement benefits even though he had reached the 80% benefit cap under HRS § 88-74. He argues that Act 121, which added a new subsection (c) to HRS § 88-98, represented a change to the statute, not just a "clarification," as argued by ERS and concluded by the circuit court. Perry contends that HRS § 88-98(a), in effect throughout the period of time in question, expressly provided that "any" retirant returning to service was entitled to earn additional retirement benefits, even if the retirant had reached the maximum cap of 80% upon the first retirement.

ERS argues that, pursuant to the plain and unambiguous language of HRS § 88-74(a)(1), viewed in *pari materia* with HRS § 88-98(a)(2), Perry was always subject to the 80% cap on his police officer retirement benefits. ERS also asserts that HRS § 88-98(a)(1)(A) expressly provides that the calculations for a retirant's re-employment period are subject to the "benefit formula under section 88-74," including the 80% cap on the maximum retirement benefits.

(1) The Relevant Statutes

(a) Active membership in ERS

All employees entering or re-entering service are required to enroll as active members of ERS, pursuant to HRS §§ 88-42 (1993) and 88-98(a).

HRS § 88-42 provides, in relevant part, that

> §88-42 **Membership generally.** Except as otherwise provided in this part, all employees of the Territory or any county on July 1, 1945, shall be members of the system on such date, and <u>all persons who thereafter enter or reenter the service of the State or any county shall become members at the time of their entry or reentry</u>.

(Emphasis added.)

11

HRS § 88-98(a) requires that, for any retirant whose employment required active membership, the retirant was to be "reenrolled as an active member of the system in the same class from which the retirant originally retired[.]"

**(b) Contributions by member to ERS**

Perry was a class B member when he retired in 2002 and was re-enrolled as a class B member when he returned to work in 2007. Pursuant to HRS § 88-45 (Supp. 2010),[7] ERS was required to collect contributions from Perry to the ERS annuity savings fund. The requirement that ERS collect contributions from re-enrolled members was nullified, in part, by the enactment of Act 121. The relevant portion of Act 121, as codified in HRS § 88-98(c)(2),[8] exempted members who had already reached their maximum benefit level from having to make retirement contributions.

**(c)  Maximum retirement allowance cap upon retiring a second time**

HRS § 88-98(a) provides that if a previously retired member returns to service and retires again, his retirement allowance is equal to the allowance he was entitled to after his first retirement, plus an additional amount based on the retirement allowance option he had selected when he initially retired, his age, years of service, average final compensation,

---

[7]  HRS § 88-45 provides:

**§88-45. Employee contributions.** After June 30, 1988, each class A and class B member shall contribute seven and eight-tenths per cent of the member's compensation to the annuity savings fund[.]

[8]  HRS § 88-98(c) provides, in relevant part:

(c) If a retirant's maximum retirement allowance upon the retirant's initial retirement was subject to the limits on maximum retirement allowance under section 88-74:

. . .

(2)    If the retirant's maximum retirement allowance upon the retirant's initial retirement was equal to or greater than the applicable limit under section 88-74, the retirant shall not earn service credit or earn any additional retirement allowance during the retirant's period of reemployment, and the reemployed retirant shall not make any contributions under section 88-45.

and other factors "in accordance with the benefit formula under section 88-74 in existence at the time of the member's latest retirement." Section 88-74(a) sets the maximum retirement allowance at 80% of the member's average final compensation.

### (d) Effect of unused sick leave on calculation of total years of service

The final statute to guide the calculation of an ERS member's retirement benefits is HRS § 88-63. This statute allows an ERS member who leaves government service in good standing with sixty days or more of sick leave to increase the member's years of service at the rate of one month of service credit for every twenty days of unused sick leave.

### (2) Statutory Interpretation of HRS Chapter 88

"The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which [the appellate] court reviews de novo. Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." Liberty Mutual Fire Ins. Co. v. Dennison, 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (internal quotation marks and citation omitted). Where there is ambiguity, the courts may examine the context "with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool." Morgan v. Planning Dep't, County of Kaua'i, 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004) (quoting State v. Sullivan, 97 Hawai'i 259, 262, 36 P.3d 803, 806 (2001) (internal quotation marks and citation omitted)). We accord judicial deference to ERS's interpretation of the statute unless "the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate." TIG Ins. Co. v. Kauhane, 101 Hawai'i 311, 321, 67 P.3d 810, 820 (App. 2003) (internal quotation marks, citation, and brackets omitted).

(a)    80% cap on police officer retirement benefits
       under HRS § 88-74(a)(1)

In 1967, the Legislature enacted Act 130, which
increased the retirement benefits for police officers from 2% to
2.5%.  S. Stand. Comm. Rep. No. 855, in 1967 Senate Journal, at
1221.  At the same time, in an apparent trade-off for the .5%
increase in retirement benefits, Act 130 capped a police
officer's maximum retirement allowance at 80% of his average
final compensation.[9]  1967 Haw. Sess. Laws. Act 130, § 2 at 121.
The 80% benefit cap language plainly and unambiguously provides
that a police officer's maximum retirement allowance "shall not
exceed" 80% of the police officer's average final compensation.

The legislative history of Act 130 also indicates ERS
was required to return to the member any amount in excess of the
80% cap.  "Although the bill provides for an 80 per cent
limitation of the average final compensation, it also requires
the refund of that portion of the member's contributions which is
determined to be in excess of this limitation."  See S. Stand.
Comm. Rep. No. 761, in 1967 House Journal, at 771.

(3)    Relationship between HRS §§ 88-98(a)(1),(2) and
       88-74(a)(1)

Because Perry returned to service after June 30, 1998,
HRS § 88-98(a)(2) applied, which provided that Perry's second
retirement allowance would be computed in accordance with
HRS § 88-98(a)(1)(A).  Upon his second retirement, Perry would
receive the retirement allowance he was entitled to after his
first retirement, plus

> the allowance to which the member is entitled for that
> service based on the retirement allowance option initially
> selected and computed for the member's age, average final
> compensation, and other factors in accordance with the
> benefit formula under section 88-74 in existence at the time
> of the member's latest retirement[.]

---

[9]  Act 130 was codified as part of Revised Laws of Hawai'i (RLH) § 6-42
(1955).  By 2002, when Perry retired, the 80% cap was found in HRS § 88-74(1)
(Supp. 2002).  In 2007, when Perry re-entered service, the 80% cap was in
HRS § 88-74(a)(1)(Supp. 2007).

HRS § 88-98(a)(1)(A). This statute directs one back to HRS § 88-74 for the formula to calculate retirements benefits and includes the 80% cap.

Act 121 clarified the relationship between HRS §§ 88-98 and 88-74 by amending HRS § 88-98 to provide, in relevant part, that

> (2) If the retirant's maximum retirement allowance upon the retirant's initial retirement was equal to or greater than the applicable limit under section 88-74, the retirant shall not earn service credit or earn any additional retirement allowance during the retirant's period of reemployment and the reemployed retirant shall not make any contributions under section 88-45[.]

2009 Haw. Sess. Laws, Act 121, § 3 at 318-19, enacted as HRS § 88-98(c)(2). The legislative history of Act 121 indicates its purpose was

> to clarify certain provisions relating to [ERS] by, among other things, specifying that:
> . . .
>
> (4) The cap on the maximum retirement allowance imposed on certain members also apply to the retirant's benefits when they are reemployed;
>
> (5) ERS shall not collect retirement contributions from reemployed retirants who reach the maximum average final compensation ceiling[.]

H. Stand. Comm. Rep. No. 1706.

Furthermore, "[t]he clarifications contained in this measure will conform existing ERS statutes to current practice and help to streamline the administration of the ERS, allowing the ERS to provide more accurate and efficient service to their members." H. Stand. Comm. Rep. No. 1239.

The Legislature amended HRS § 88-98 several times but at no time did they exempt benefits earned for actual service during re-employment from the 80% cap set under HRS § 88-74, as they had done for unused sick leave. See HRS § 88-63. Because we can presume the Legislature knows existing law and the relationship between HRS §§ 88-98 and 88-74, the lack of action in exempting benefits from the 80% cap suggests there was no intention to do so. Agustin v. Dan Ostrow Const. Co., Inc., 64

15

Haw. 80, 83, 636 P.2d 1348, 1351 (1981) ("[T]he legislature is presumed to know the law when enacting statutes[.]")

Finally, if benefits could be added to a police officer's retirement allowance after his second retirement without regard to the 80% cap, police officers could easily evade the cap by retiring and then later returning to service. To interpret and apply HRS § 88-98 in this manner renders the statute meaningless and leads to an absurd result. Morgan, 104 Hawai'i at 185, 86 P.3d at 994 ("The legislature is presumed not to intend an absurd result[.]") (internal quotation marks, citation, and brackets omitted).

In light of the legislative history behind HRS § 88-98, and viewed in *pari materia* with HRS § 88-74, we conclude that at all times relevant to this case, Perry was not entitled to earn an additional retirement allowance upon re-entry into service beyond the 80% cap reached in his first service. The provisions of HRS Chapter 88 in effect in 2007 barred Perry from receiving service credit beyond the statutory cap. HRS § 88-98 required "any" retirant to re-enroll as an active ERS member and required ERS to suspend the retirant's retirement allowance. The retirant's compensation upon his second retirement is to be calculated according to the benefit formula under HRS § 88-74, which capped a police officer's maximum retirement allowance at 80%. The effect of HRS § 88-98(c) was to (1) clarify that the 80% benefit limit under HRS § 88-74 applied to a retirant who returns to service and (2) release ERS from the requirement to collect contributions from those not qualified to receive additional benefits.

Our conclusion that the circuit court did not err in affirming the ERS's decision against Perry is supported by the general judicial deference accorded to ERS's interpretation of the statute. See Haole, 111 Hawaii at 150, 140 P.3d at 383.

16

B.   Perry incorrectly applies <u>Kim v. Employees'</u>
<u>Retirement System</u>, 89 Hawai'i 70, 968 P.2d 1081
(App. 1998) to the instant case.

Perry asserts that <u>Kim v. Employees' Retirement System</u>,
89 Hawai'i 70, 968 P.2d 1081 (App. 1998) stands for the
proposition that under HRS § 88-98, Perry's first and second
retirement benefits should be calculated "separately and
independently" based on separate credited years.  We disagree.
<u>Kim</u> did not concern a retirant who had reached the 80% cap on his
maximum retirement allowance; rather, the issue was whether, upon
Kim's second retirement, ERS could reduce Kim's monthly benefit
by the monthly benefits ERS had paid out during Kim's first
retirement.  The question before this court was what it meant
under HRS § 88-98 (1993) to calculate Kim's benefits "as if the
retirant were retiring for the first time[.]"  <u>Kim</u>, 89 Hawai'i at
71, 968 P.2d at 1082.

Without any discussion of the 80% benefit cap, the
court determined that Kim's total years of credited service were
properly computed by combining his two periods of service.  <u>Id.</u>
at 76-77, 968 P.2d at 1087-88.  The court also concluded that
Kim's monthly benefit could not be reduced by the total of the
monthly payments made during his first retirement.  <u>Id.</u>  If
anything, <u>Kim</u> supports ERS's position in the instant case because
this court affirmed that HRS § 88-98 required ERS to compute a
retirant's credited service years by combining both periods of
service.  <u>Id.</u> at 73, 968 P.2d at 1084.

C.   **Perry incorrectly argues that his HPD retirement
allowance was suspended in exchange for the right
to earn an additional retirement allowance.**

Perry argues that if he was not entitled to earn a
second retirement benefit allowance, "he would not have been
required to enroll in ERS and have his HPD benefits suspended."
He contends his retirement allowance was suspended in exchange
for the right to earn additional benefits.  This is an incorrect

17

contention because ERS was statutorily required to enroll Perry in ERS and suspend his retirement benefits, pursuant to HRS §§ 88-42 and 88-98 (a). Therefore, Perry's argument that his HPD retirement benefits were suspended in exchange for the right to earn an additional retirement allowance is without merit.

> D. The circuit court did not err in concluding that Perry's issue about having made contributions to ERS through payroll deductions is moot.

From October 1, 2007 until the September 1, 2009 payroll period, Perry contributed to ERS through payroll deductions as mandated by HRS § 88-45. Before the passage of Act 121, ERS had no choice but to take annuity fund payroll deductions from every member, including members who were not eligible to accrue any additional retirement benefits because they had reached the 80% cap under HRS § 88-74. Under ERS's interpretation of federal tax law, ERS was required to refund those excess funds to members ineligible to receive additional benefits. In its September 23, 2009 letter, ERS informed Perry that it would refund Perry's retirement contributions made since October 1, 2007 because Perry was not eligible to accrue any additional retirement benefits.

Perry argues that the issue of the deductions was not moot because "[p]romising after the fact that the money will be returned is obviously no excuse or defense for taking someone's pay without authorization in the first place." Perry also argues that the fact that ERS took contributions was indicative of Perry's entitlement to additional retirement benefits.

Perry's arguments are without merit. As has just been discussed, until passage of Act 121, ERS was required to take a percentage of every member's paycheck. With the passage of Act 121, ERS no longer had to take funds from those members who were ineligible to accrue additional retirement benefits. Perry was promised a refund of ERS contributions made since October 1, 2007, along with interest on those funds.

The circuit court did not err in determining the issue regarding payroll deductions was moot when Perry's funds had been returned to him with interest. "A case is moot where the question to be determined is abstract and does not rest on existing facts or rights." State v. Fukusaku, 85 Hawai'i 462, 474-475, 946 P.2d 32, 44-45 (1997) (citing AIG Hawai'i Ins. Co., Inc. v. Bateman, 82 Hawai'i 453, 458-59, 923 P.2d 395, 400-01 (1996) (quoting In re Application of J.T. Thomas, 73 Haw. 223, 225-26, 832 P.2d 253, 254 (1992)).

> E.    The circuit court erred in concluding that Perry waived his state constitutional claim under article XVI, section 2 of the Hawai'i Constitution,[10] but did not err in concluding that Perry waived his Contract Clause claim under article I, section 10 of the United States Constitution.[11]

In its Decision and Order, the circuit court found the following:

> 16. There was no error in the Findings of Fact, Conclusions of Law and Final Decision and Order of the ERS Board, dated March 23, 2010, which found no violation of Article XVI, Section 2 of the Hawaii Constitution.
>
> 17. For the first time on appeal, Appellant appears to raise a claim that the ERS violated the State or Federal Contracts Clause. Appellant has not shown the Court that this constitutional argument was properly preserved for this appeal. The Court considers the argument waived and does not consider it on this appeal.

To preserve his constitutional claims before the circuit court, Perry must have raised the claims in his appeal before ERS. Hawaii Ventures, LLC v. Otaka, Inc., 114 Hawai'i 438, 500, 164 P.3d 696, 758 (2007) (citing to HRS § 641-2 (Supp.

---

[10]    Article XVI, section 2 of the Hawai'i Constitution provides:

> **Section 2.** Membership in any employees' retirement system of the State or any political subdivision thereof shall be a contractual relationship, the accrued benefits of which shall not be diminished or impaired.

[11]    Article 1, section 10 of the United States Constitution states, in relevant part, that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"

2006) ("The appellate court ... need not consider a point that was not presented in the trial court in an appropriate manner.")).

Perry effectively preserved his state constitutional claim in his January 26, 2010 letter to ERS, in which he cites to article XVI, section 2 of the Hawai'i Constitution and argues that ERS's application of HRS § 88-98(c)(2) "diminished and impaired my ERS benefits protected by the Hawaii State Constitution." Furthermore, the circuit court addressed the issue on appeal. Therefore, Perry's argument as it relates to the Hawai'i Constitution was preserved and will be addressed in the next section.

On the other hand, Perry concedes he failed to raise his Contract Clause claim in the administrative proceedings. Nonetheless, he argues that under HOH Corp. v. Motor Vehicle Industry Licensing Board, 69 Haw. 135, 736 P.2d 1271 (1987), a failure to raise a constitutional argument below does not waive his right to raise it on appeal. HOH, 69 Haw. at 142, 736 P.2d at 1275. In HOH, the issue was the constitutionality of a statute. Although HOH failed to raise the constitutionality issue in the administrative hearing, the Hawai'i Supreme Court held that HOH could raise it on appeal because an administrative agency "generally lacks power to pass upon the constitutionality of a statute." Id. at 141, 736 P.2d at 1275.

HOH does not apply to the instant case because Perry is not challenging on Contract Clause grounds the constitutionality of a provision that the ERS lacked the power to pass upon. On appeal, Perry is merely raising a claim that ERS violated the Contract Clause, a claim he failed to raise below. Because Perry failed to raise the alleged Contract Clause claim before ERS, the circuit court correctly found that Perry had waived that argument on appeal. Waikiki Resort Hotel, Inc. v. City & Cnty. of Honolulu, 63 Haw. 222, 250, 624 P.2d 1353, 1372 (1981) ("[T]he general rule that an appellate court will consider only such questions as were raised and reserved in the lower court applies

20

on review by courts of administrative determinations so as to preclude from consideration questions or issues which were not raised in administrative proceedings.").

> E. **The circuit court did not err when it determined ERS did not violate article XVI, section 2 of the Hawai'i Constitution.**

Perry contends his benefits were "diminished and impaired," in violation of article XVI, section 2 of the Hawai'i Constitution, when ERS suspended Perry's HPD retirement benefits but denied him the right to earn additional retirement benefits for his service as police chief. However, the legislature is not precluded from reducing a member's benefits with respect to future service provided the reduction is not applied to benefits already earned. See Comm. of the Whole Report No. 18, Journal of the Const. Con. of 1950, p.330; Chun v. Board of Trustees, 61 Haw. 596, 606, 607 P.2d 415, 421 (1980) (the legislature may reduce benefits as to a person's future services).

As previously discussed, HRS §§ 88-74(a) and 88-98(a) were both in effect at the time of Perry's re-enrollment on October 1, 2007. Pursuant to these statutes, Perry was not entitled to additional retirement benefits because he had already reached the 80% maximum retirement allowance for police officers. Because these statutes were in effect throughout Perry's first service, retirement, and reentry into service, the application of the statutes' provisions, including the 80% cap on benefits, does not diminish or impair Perry's accrued benefits and, consequently, does not violate the article XVI, section 2. Because Perry had not accrued any benefits, he had no benefits that were "diminished or impaired" by the enactment of Act 121.

## IV.   CONCLUSION

The Final Judgment filed on March 24, 2011 in the Circuit Court of the First Circuit is affirmed.

DATED:   Honolulu, Hawai'i, April 20, 2012.


On the briefs:

Bruce H. Wakuzawa
for Appellant-Appellant.

Brian P. Aburano
Diane Erickson
Deputy Attorneys General
for Appellee-Appellee.

Chief Judge

Associate Judge

Associate Judge